[Civ. No. 34512. Second Dist., Div. Five. Aug. 4, 1970.]

RODWIN METALS, INC., Plaintiff and Respondent, v.
WESTERN NON-FERROUS METALS, INC., Defendant and Appellant.

220

## Counsel

Hutchinson & Irwin and James A. Irwin for Defendant and Appellant.

Walzer, Weinstock, Manion & King and Stuart B. Walzer for Plaintiff and Respondent.

## Opinion

**KAUS, P. J.**—After a court trial, plaintiff recovered a judgment against defendant for breach of contract. Defendant appeals from the judgment.

By written contract dated August 25, 1964, plaintiff agreed to sell defendant about 500 metric tons of lead fume.[1] Under the terms of the agreement the material was to be ready "upon one week to ten days notice." The contemplated time for delivery was "early September." Physically the delivery was to be completed "within seven days total . . . F.A.S. Philadelphia Dock." Defendant was to pay $10,000 when advised of the day delivery was to begin, the balance after an assay of the shipment and certain other documents were received.

The parties contemplated that, after the delivery to the dock, defendant would ship the lead fume to Japan. Plaintiff duly made arrangements to purchase the lead fume from its supplier. The supplier pressured plaintiff to pay for and remove the material from its yards, and plaintiff in turn began in early September to request that defendant fix a delivery date. Defendant, however, experienced difficulty in finding a vessel which would accept the shipment in bulk, and therefore declined to set a date.

During late September and early October plaintiff's president, Irwin Axelrod, and defendant's president, Herman Sall, negotiated over the telephone to remove the impasse. By October 1 or 2 the two men orally agreed that plaintiff should deposit the lead fume in the Reading Railroad yard in Philadelphia. To help plaintiff meet its supplier's demands for the purchase price of the material, Sall promised to advance plaintiff $20,000 on the contract price.

At trial Axelrod and Sall disputed whether, under the parties' new arrangement, plaintiff was obligated to do more than deliver the fume to the

---

[1] Plaintiff's president described lead fume as follows: "Lead fume is a product that is recovered from a lead smelting furnace, from the smokestack. In this case they bombard the smoke with water under high pressure and knock down the parge particles of lead and that is recovered later. The water is drained off and the lead that remains with some of the moisture is called lead fume dust or lead fumes . . . It is [then] resmelted and made lead out of again."

railroad yard. Axelrod testified there was no further obligation. Sall testified that plaintiff agreed to haul the material to the dock as required in the written contract if " 'we get a boat within a reasonable period of time. . . .' "

On October 5 the oral agreement temporarily changing the destination of the lead fume was confirmed in writing, and a check for $20,000 was delivered to plaintiff. The contract, which was in the form of a letter to plaintiff, contained the following paragraph: "This material is being moved by you to a Reading Railroad yard for storage. After the entire amount has been removed to this yard and the material has been assayed and certified weights furnished, the balance, as per the contract, will be forthcoming." The same day plaintiff made arrangements for trucking the material to the railroad yard.

After the transfer had started, Axelrod received a letter from defendant, dated October 7, advising him that defendant had finally located a vessel that would accept the lead fume in bulk form. The letter requested plaintiff to make arrangements for the delivery of the shipment to the boat, the S.S. Hai Hsin, which was scheduled to sail on October 16. In the letter plaintiff was informed for the first time that the lead fume must arrive in railroad gondola cars. Axelrod immediately telephoned Rose Siminow, who was in charge of defendant's export program.[2] He told her that it was impossible to deliver the shipment in gondola cars by October 16. Mrs. Siminow requested that Axelrod "see what could be done."

Axelrod agreed to make the effort. During the week ending October 12 he telephoned Mr. Lonneman of Lavino Brothers.[3] Lonneman told him that Lavino's chemist would have to approve the shipment before it could be accepted. Axelrod met the chemist at the railroad yard, where the latter took a sample of the lead fume for analysis. On October 10 or 11 plaintiff's president again telephoned Lonneman. He was told that the shipment was acceptable but that it must be delivered by gondola car, ". . . that they could accept it no other way."

On October 12, Herman Sall's brother, George, telephoned Axelrod and told him that his, George's, traffic manager had discovered a location at which plaintiff's trucks could load the lead fume directly into gondola cars,

---

[2] Mrs. Siminow wrote and signed the letter of October 7.

[3] The record is not too clear with respect to the status of Lavino Brothers. The October 7 letter referred to the firm as the ship's "port manager." The testimony indicated, somewhat inconclusively, that they were "the steamship company that books this freight . . . the agent of whatever steamship company it was that owned and operated the vessel." The matter is of some importance, since defendant's brief constantly refers to Lavino Brothers as the "Philadelphia Port Authorities" thereby giving more color to its claim of impossibility.

thus eliminating the intermediate steps of dumping it on the ground and picking it up and placing it in the cars. Together, Axelrod and George Sall viewed the suggested location. They agreed, however, that it was inadequate. The two then proceeded to George Sall's office where George telephoned Herman Sall. He told Herman that despite all of their efforts it would be impossible to meet the Hai Hsin's sailing date. Axelrod took the phone and described the facilities at the railroad yard for storing the material. Then Herman Sall asked how much plaintiff had paid for the lead fume. Axelrod responded that it was none of Sall's business. Sall ended the conversation by saying, "Well, I'm not going to allow you to make a profit if I have to suffer a loss and I am stopping payment of the check." On October 12 defendant stopped payment on the $20,000 check. The same day plaintiff received a telegram from defendant. It read: "We have today stopped payment on advance for $20,000 against lead fume because of your inability to fulfill contractual terms."

Plaintiff continued to carry the lead shipment to the railroad yard, completing delivery by October 25. After giving defendant notice of its intention to conduct a private sale, and after making price inquiries of various business houses in the trade, plaintiff resold the lead fume to a third party at what the court found to be a "fair and reasonable market price." The court found that the difference between the contract price and resale price was $10,270.94. In addition, the court assessed plaintiff's incidental damages at $350. It awarded plaintiff judgment for the sum of these amounts. Defendant has appealed from the judgment.

## I.

Defendant's first contention on appeal is that plaintiff's failure to deliver the lead fume to the Philadelphia dock in gondola cars gave defendant the power to rescind the contract. Defendant argues that it was discharged because of the impossibility of loading the ship or by plaintiff's anticipatory repudiation of its contractual obligations.

To answer that question, we have to determine just what the trial court found the plantiff's obligation to be and whether or not that finding is supported by the evidence.

The court found that the October 5 modification obligated plaintiff to deliver the lead fume to the Reading Railroad yard. This finding is amply supported by the text of the agreement previously quoted. Defendant argues that plaintiff's efforts to aid in delivering to the ship demonstrate that its obligation was not discharged by delivery to the yard. The court was not, however, bound to equate an accommodation with the performance of a contractual duty. Moreover, Herman Sall's statement with respect to his

unwillingness to suffer a loss while plaintiff was making a profit strongly indicates that he considered his firm responsible for any extra expenses incurred because of the difficulties in delivering to the ship.

Since plaintiff's performance was neither impossible nor repudiated but was, in fact, complete, the finding that defendant breached the contract is unimpeachable.

## II.

 Defendant's next contention has merit. The total contract price depended on the exact weight and metallic content of the lead fume delivered by plaintiff. The only evidence produced on that issue was a piece of paper brought to court by Mr. Axelrod. It purports to be on the letterhead of and signed by one Alfred J. Cooke, whom Axelrod described as "the most respected man in his field in the City of Philadelphia." He was not, however, familiar with Cooke's signature. He had called Cooke by telephone when the material was first being delivered to the railroad and asked him to assay a sample.[4] He eventually received the assay through the mail.[5] Neither Axelrod nor any of his representatives were present when the sample was taken.

Although the court, at first, correctly pointed out that plaintiff had not adequately proved one of the foundations necessary before the assay could be considered a business record under section 1271 of the Evidence Code, namely the "mode of its preparation,"[6] it then changed its mind when defendant's counsel stated that he did not claim that the assay was "fictitious." As soon as that statement was made the court said: "THE COURT: This is enough for me as far as I am concerned. If you are trying to show it is fraudulent, that's different. But a record like this is an ordinary business record. It is something from a neutral party, a person who has an organization as a chemist and assayer and their report is entitled to great weight, especially in a field as simple as this one. This is a very simple chemical analysis, quantitatively and qualitatively. I think it is entitled to great weight. You may proceed."

---

[4]The record is murky with respect to Cooke's supposed activity in weighing the fume.

[5]This appears to be a sufficient authentication of the assay under section 1420 of the Evidence Code: "A writing may be authenticated by evidence that the writing was received in response to a communication sent to the person who is claimed by the proponent of the evidence to be the author of the writing." Authentication, however, is not the problem.

[6]There was at least one more problem. The assay was ordered in October when the lead fume arrived at the yard. Delivery to the new buyer was made December 31. The assay is dated December 30. Query, whether it was made "at or near the time of the act, condition, or event." (Evid. Code, § 1271, subd. (b).)

 Counsel does not have to claim fraud in order to insist that hearsay be rejected absent a proper foundation for an exception. Of course the trial court has some discretion in determining just how much proof concerning the "mode of preparation" of a chemical analysis is required. In the present case, however, there was none at all. Without belaboring the point a comparison between the foundational proof in *Nichols* v. *McCoy,* 38 Cal.2d 447, 449-450 [240 P.2d 569] and *Barker* v. *California-Western States Life Ins. Co.,* 252 Cal.App.2d 768, 779-780 [61 Cal.Rptr. 595], where such proof was held sufficient, and *Pruett* v. *Burr,* 118 Cal.App.2d 188, 196-203 [257 P.2d 690] and *McGowan* v. *City of Los Angeles,* 100 Cal.App.2d 386, 391-392 [223 P.2d 862, 21 A.L.R.2d 1206], where it was held inadequate, easily demonstrates that this case is governed by the latter two decisions.

Plaintiff also contends that Axelrod, as its president, was really the owner of the lead fume and could therefore testify to its value. Putting aside the problem whether a corporate officer, as such, can be considered an "owner" within the meaning of section 813 of the Evidence Code (see 5 A.L.R. 1171; 45 A.L.R. 1494), the short answer to the suggestion is that Axelrod never expressed his own personal opinion of value. The assay related solely to purchase price.

Plaintiff also claims that Axelrod was a true expert who could express his opinion concerning the lead content of the fume based on Cooke's report. Quite apart from the problem of one expert basing his testimony on absolutely nothing except his expert opinion concerning the reliability of another expert (cf. *Springer* v. *Reimers,* 4 Cal.App.3d 325, 338 [84 Cal. Rptr. 486]; Evid. Code, §§ 801, 804), the plain fact is that Axelrod never did purport to state his own opinion of the lead content of the fume and would have been incompetent had he attempted to do so. The record shows that he is a dealer in lead fume, not a chemist.

Finally plaintiff suggests that the assay was admissible, not for its truth, but to show that plaintiff had complied with a condition of his contract which called for the furnishing of an assay. It was not offered for that purpose and would have been irrelevant, for after defendant's breach plaintiff was under no obligation to go through the idle act of having the fume analyzed. If the lack of an assay made it impossible for plaintiff to prove damages in a later trial, defendant would not have been aggrieved. In any event, even if the assay had been admissible for such a limited purpose, the lack of any other evidence of contract price would still compel us to reverse.

### III.

When plaintiff resold the lead fume after defendant's breach, it incurred an expense of $350 in loading the material upon railroad cars for shipment to the new purchaser. Defendant complains on appeal that plaintiff would have incurred this expenditure even if the contract had not been terminated, since it was obligated thereunder to transport the lead fume to the Philadelphia dock. What we said in part I of this opinion makes clear that, as things turned out, plaintiff had no such duty. Therefore, this item of incidental damages was properly allowable.

### IV.

Defendant's final contention boils down to a claim that the court's findings of fact do not support a judgment for breach of contract. This simply is not so. The court found (1) that plaintiff and defendant entered into a contract for the sale of lead fume, (2) that plaintiff performed its duties thereunder until defendant's breach, (3) that defendant breached the contract by stopping payment on its check for $20,000, and (4) that plaintiff suffered damages as a result of the breach. (2 Witkin, Cal. Procedure (1954) Pleading, § 251, p. 1226.)

### V.

Since the only error committed related to a single item—the contract price—relevant in the computation of damages, no new trial on all issues is required. (*Cunningham* v. *Simpson,* 1 Cal.3d 301, 310-311 [81 Cal.Rptr. 855, 461 P.2d 39].) It is not even necessary to retry any other disputed fact relating to damages.

That portion of the judgment ordering that plaintiff recover the sum of $10,270.94 in general damages is reversed, with directions that the court retry the sole issue of the contract price and, after such trial, award plaintiff such general damages as appear to be proper. In all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

Stephens, J., and Reppy, J., concurred.