[Civ. No. 27618. Fourth Dist., Div. Two. July 6, 1982.]

MILES LABORATORIES, INC., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
SUSAN FISHER, Real Party in Interest.

COUNSEL

Kinkle, Rodiger & Spriggs, George P. Kinkle and Bradley S. Sures for Petitioner.

No appearance for Respondent.

Robinson, Robinson, Pike, Hahn & Philipson and John D. Rowell for Real Party in Interest.

OPINION

**TROTTER, J.**—Plaintiff (Susan Fisher) brought an action against a number of pharmaceutical companies, including Miles Laboratories, Inc. (Miles) for personal injuries allegedly sustained by reason of her mother's ingestion during pregnancy of the drug diethylstilbestrol (DES), a synthetic compound of the female hormone estrogen. Defendant Miles moved for summary judgment on the ground it manufactured and marketed DES for use only as a palliative treatment of prostate cancer in males, not for female use as a miscarriage preventative. The trial court denied the motion without prejudice. Miles thereafter filed the instant petition seeking a peremptory writ of mandate from this court to compel the trial court to vacate its order denying the motion for summary judgment and to grant the same. We issued an alternative writ and order to show cause.

Proper assessment of the trial court's action requires a summation of the basic allegations of plaintiff's complaint, a review of the principles enunciated in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], on which the instant action is predicated, and an examination of the summary judgment motion and the opposition thereto.

a. *The Complaint*:

The basic allegations of the complaint may be summarized as follows:

Defendants, individually and in concert, promoted the sale of DES from 1941 to 1971 for use by pregnant women for the prevention of miscarriages. Defendants knew or should have known that DES was neither safe nor effective for that purpose. In 1947 the FDA authorized production of the drug for use by pregnant women to avoid miscarriage but solely on an experimental basis and only with an express warning to that effect on labels. Despite the limited FDA authorization, defendants marketed and promoted the sale of DES on an "unlimited and wide-open basis" as a miscarriage preventative without any warning as to the experimental nature of the drug or of its potential carcinogenic effect.

In 1971 the FDA ordered defendants to cease marketing and promoting DES as a miscarriage preventative and to warn physicians and the general public that the drug should not be used by pregnant women because of the carcinogenic dangers to their children. The FDA action was based on hospital reports concerning the carcinogenic effect on daughters of women who used the drug. The form of cancer suffered by the daughters is known as adeno-carcinoma, a fast-spreading, deadly growth with minimum treatment calling for radical surgery. The disease manifests itself after a minimum latent period of 10 or 12 years.

Plaintiff was born in October 1961 and was exposed to DES through her mother who ingested the drug as prescribed during her pregnancy. Though there were other safe and effective drugs for the prevention of miscarriage, physicians were persuaded to prescribe DES by defendants' promotional advertising concerning its safety and effectiveness. As a result of her exposure to DES, plaintiff was required to undergo surgical removal of her female reproductive organs.

Defendants acted in concert, on the basis of express and implied agreement and by the ratification, exploitation, and adoption of each other's testing and marketing methods. Defendants were jointly liable regardless of the particular brand of DES ingested by plaintiff's mother because defendants collaborated in testing, marketing and promoting the drug as fungible and interchangeable regardless of the brand name and because it was the practice of physicians to prescribe DES by its generic rather than brand name and of pharmacists to fill such pre-

scriptions from whatever brand of DES they happened to have on hand and that "[d]efendants planned for, exploited and reaped the profits from this marketing and promotional scheme."

b. *The Case of Sindell v. Abbott Laboratories*:

In the recent landmark decision of *Sindell v. Abbott Laboratories, supra,* 26 Cal.3d 588, our Supreme Court addressed the problem faced by plaintiffs, such as Susan Fisher herein, who are unable to identify the manufacturer of the DES which was ingested by their mothers. The court adapted the principle enunciated in *Summers v. Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91] to the circumstances of the DES cases.[1] The court reasoned that in the context of the DES cases it would be reasonable "to measure the likelihood that any of the defendants supplied the product which allegedly injured plaintiff by the percentage which the DES sold by each of them for the purpose of preventing miscarriage bears to the entire production of the drug sold by all for that purpose." (*Sindell v. Abbott Laboratories, supra,* 26 Cal.3d 588, 611-612.) Accordingly, the court stated that "[i]f plaintiff joins in the action the manufacturers of a substantial share of the DES which her mother might have taken, the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff is significantly diminished." (*Id.,* at p. 612.) The court declined to require a specific percentage of the market to be joined, holding that it was only requiring "a substantial percentage." (*Id.,* at p. 612.)

The *Sindell* court held that when a substantial share of the market has been joined, each defendant "will be held liable for the proportion of the judgment represented by its share of that market *unless it demonstrates that it could not have made the product which caused plaintiff's injuries.*" (*Sindell v. Abbott Laboratories, supra,* 26 Cal.3d 588, 612.) The court noted that one DES manufacturer in *Sindell* was dismissed from the action upon proof by declaration that it had not manufactured DES until after plaintiff was born.

---

[1] In *Summers v. Tice, supra,* 33 Cal.2d 80, two hunters negligently shot in plaintiff's direction. One of the shots struck plaintiff but it could not be determined which hunter fired the shot. The court held that in such circumstances the burden shifted to each defendant to absolve himself if he could. Otherwise, both defendants would be held liable jointly and severally for the entire damage.

c. *The Summary Judgment Motion and Opposition*:

Defendant Miles' motion for summary judgment was supported by declarations from its attorney and from C. J. O'Donovan, M. D., "Vice President, Medical Affairs" for Miles. The attorney's declaration simply consists of argument that by virtue of O'Donovan's declaration the motion for summary judgment should be granted.

O'Donovan's declaration states: In 1955 Miles received FDA approval of its New Drug Application for use of DES intravenously and in 1956 for use in tablet form, both solely for treatment of prostatic cancer. Miles has never sought FDA approval for the investigational or clinical use of DES for any other purpose. Since November 1955, Miles has manufactured and sold DES for intravenous use and since August 1956 in tablet form, both under the trade name "STILPHOSTROL," for palliative treatment of prostatic cancer.

The "official wording" as to the indications for use of Miles' brand of DES was as follows: "'STILPHOSTROL is indicated for the treatment of prostatic carcinoma. It may be found particularly useful in advanced stages where tolerance to other estrogen regimens has developed. It has been postulated that diethylstilbestrol sodium diphosphate exerts a cytolytic effect in prostatic carcinoma.'" Miles has never marketed, promoted or sold DES in any form for use by women.

There is attached to O'Donovan's declaration a copy of what purports to be a January 1981 report entitled "The Use of STILPHOSTROL in the United States 1960-1979 'A *National Disease and Therapeutic Index* Review'" prepared by a research group known as IMS America, Ltd. for the Associate General Counsel of Miles at the request of Miles. Based on that report, O'Donovan states that for the period 1960-1979 there was no instance in which STILPHOSTROL "was ever used by a physician on a female for treatment of the complications of pregnancy."

O'Donovan also states that Miles did not collaborate with or in any way participate with other drug companies in the manufacture, marketing, promotion or sale of DES for use by women in preventing miscarriages.

Plaintiff filed opposition to the motion for summary judgment and objection to O'Donovan's declaration. Plaintiff opposed the summary judgment motion on the ground that O'Donovan's declaration failed to

negate all of the causes of action and theories of liability embodied in her complaint. Plaintiff objected to the admissibility of the report attached to O'Donovan's declaration and his statements based upon that report on grounds of hearsay and lack of proper foundation.

The only declaration filed by plaintiff was one by her attorney stating it is general knowledge that it is the practice of physicians in writing prescriptions to use the generic name of drugs and that therefore a prescription for DES could have been filled by a pharmacist with whatever brand of DES he happened to have on hand, including the brand manufactured by Miles. Finally, plaintiff requested that if the court were inclined to grant Miles' motion for summary judgment, it grant her a continuance to enable her to obtain a medical expert versed in statistics in order to oppose the motion.

## ANALYSIS

For reasons expressed below we have concluded that the trial court properly denied Miles' motion for summary judgment.

The principles governing summary judgments are so well known that only a brief review of the pertinent ones is necessary. ■ A defendant moving for summary judgment has the burden of making a factual showing negating the existence of all causes of action on all theories embodied in the complaint and if he fails to discharge that burden, the motion must be denied notwithstanding the lack of opposing declarations. (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [177 Cal.Rptr. 445]; *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 662-663 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]; *Kelleher* v. *Empresa Hondurena De Vapores, S.A.* (1976) 57 Cal.App.3d 52, 58 [129 Cal. Rptr. 32]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127 [109 Cal.Rptr. 724].) ■ A summary judgment being a drastic remedy, any doubts concerning the propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 147 [60 Cal.Rptr. 377, 429 P.2d 889]; *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Supporting and opposing declarations must set forth "admissible evidence" and show affirmatively that affiant was competent to testify to the matters stated. (Code Civ. Proc., § 437c.) Evidentiary objections, however, are to be deemed

waived unless they are raised at the hearing either in writing or orally. (Code Civ. Proc., § 437c.) Moving declarations must be strictly construed and opposing affidavits liberally construed. (*Stationers Corp.* v. *Dun & Bradstreet, Inc., supra,* 62 Cal.2d 412, 417.)

■ Applying the foregoing principles to defendant's motion and supporting declarations, the trial court properly denied the motion.

In the first place, plaintiff's objection on hearsay grounds to O'Donovan's statement that there was no instance in which the Miles product "was ever used by a physician on a female for treatment of the complications of pregnancy" was valid. There was absolutely no foundation laid for the admissibility of the hearsay report on which O'Donovan based his assertion. There was no evidence concerning the identity or qualification of the members of the group that completed the report nor any evidence concerning the reliability of the sources of information, or of the methods by which the data was collected, recorded and analyzed. Thus, the report in its entirety was patently inadmissible even if it could otherwise have been considered to be a business record. (*Rodwin Metals, Inc.* v. *Western Non-Ferrous Metals, Inc.* (1970) 10 Cal.App.3d 219, 224-225 [88 Cal.Rptr. 778].) Consequently, O'Donovan's declaration fails to establish the fact that the DES marketed and sold by Miles has never been prescribed by physicians for use by females for complications during pregnancy.

Furthermore, even accepting the facts of the O'Donovan declaration, it does not reach all of the allegations of plaintiff's complaint. One of plaintiff's theories of liability as set forth in the complaint is "that it was the custom and practice of physicians to prescribe DES by its generic rather than brand name, and for pharmacists to fill such prescriptions from whatever brand of DES they happened to stock at any given time;

"f. Consequently, at all times relevant to this action, defendants knew, should have known and fully expected that promotion by any one of them, of its DES brand as a miscarriage preventative was mutually advantageous to and exploited by all defendants in boosting sales of DES for each other;

"g. At all times relevant to this action, defendants knew, should have known or fully expected that the prescriptions of DES for pregnant women were frequently filled or refilled by pharmacists from a brand of

DES other than the brand used to fill the prescription previously, or to fill a previous prescription, or by co-mingling and mixing brands to supplement a shortage in one in filling any any [sic] given prescription.

"75. Defendants planned for, exploited and reaped the profits from this marketing and promotional scheme."

The dissent would limit the liability of a manufacturer of a generic drug to situations where the drug was used only in accord with the purpose for which it was manufactured. We do not disagree with that concept but are compelled to take a broader view in light of the facts presented herein. Admittedly, the allegations in the complaint before us are new, different and an extension of the allegations made in the *Sindell* case cited above. Here, it is alleged that the defendant reaped a market share of the drug's use as a miscarriage preventative despite its production for another purpose. The allegations are that the defendant knew or should have known that its drug was being used as a miscarriage preventative and did nothing to prevent such use and by acquiescing in such use claimed for itself a share of the market.

The allegations in the *Sindell* case, as quoted by the dissent, that "[T]his litany of charges is insufficient to allege a cause of action [under the 'concert of action' theory]" is not the same allegation as is made here. The *Sindell* court held on page 605: "These allegations do not amount to a charge that there was a tacit understanding or a common plan among defendants to fail to conduct adequate tests or give. sufficient warnings, and that they substantially aided and encouraged one another in these omissions. . . . [¶] Application of the concept of concert of action to this situation would expand the doctrine far beyond its intended scope and *would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant."* (*Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588, 605; italics supplied.) Thus, the *Sindell* court was concerned with imposing liability upon an entire industry, including manufacturers which did not make the drug in question. In the instant case, we have allegations by the plaintiff in her complaint that the drug in question did cause injury and that it was, with the defendant's knowledge, used for a purpose other than that for which it was originally manufactured. This allegation was not countered in the motion for summary judgment. To limit liability solely on the declaration of defendant that it did not produce the drug for the purpose for which it was used entirely misses the point of

one of the plaintiff's allegations. The defendant gained a market share by acquiescing in the drug's use for an unintended purpose. Such conduct, if true, is certainly actionable under the logic and spirit of the *Sindell* decision.

Further, a question of fact is presented as to the adequacy of the label described by the O'Donovan declaration. Plaintiff's allegations as to the generic nature of the drug, the practices of the physicians and pharmacists in its prescription, all known to defendant and acquiesced in by defendant to seek a share of market profitability certainly creates a question of fact as to the adequacy of the warning on the label in question. Where a warning on a drug label is ambiguous, it does not as a matter of law insulate a drug manufacturer; the adequacy of the warning becomes a question of fact for the jury. (See *Stevens* v. *Parke Davis & Co.* (1973) 9 Cal.3d 51, 67 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059]; *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 402 [38 Cal.Rptr. 183].)

The trial court properly denied Miles' motion for summary judgment. The petition is denied and the alternative writ and order to show cause are discharged.

Morris, P. J., concurred.

**KAUFMAN, J.,** Concurring and Dissenting.—I concur in the judgment on a very narrow basis as I shall explain. Otherwise, I dissent from the decision and opinion of the majority for two reasons. First, the majority purport to hold that liability may be imposed under *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], on a manufacturer of a generically dispensed drug even though it did not manufacture or promote the drug for use by the person for whom it was prescribed or for the use for which it was prescribed, notwithstanding the fact the prescribed use was the sole cause of the plaintiff's injury. In so doing, the majority completely ignore the express language of and the social justification for the *Sindell* decision. Second, the majority import into the case a mislabeling or failure to warn concept which, as I shall explain, is utterly immaterial to the problem at hand since it could not have been a cause of plaintiff's injury.

In *Sindell* all of the defendants had allegedly manufactured, promoted and marketed the drug (DES) as a safe and effective miscarriage preventative (26 Cal.3d at pp. 594-595), and the decision was predicat-

ed upon that fundamental fact. The court in *Sindell* first rejected the imposition of liability strictly on the basis of the decision in *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91] (26 Cal.3d at pp. 598-603), the "concert of action" theory (*id.*, at pp. 603-606), and the theory of "enterprise liability" (*id.*, at pp. 607-610), but then, primarily on public policy bases, enunciated a new theory based on a modification of the rule of *Summers* v. *Tice*.

It did so in the following language: "Where, as here, all defendants produced a drug from an identical formula and the manufacturer of the DES which caused plaintiff's injuries cannot be identified through no fault of plaintiff, a modification of the rule of *Summers* is warranted. As we have seen, an undiluted *Summers* rationale is inappropriate to shift the burden of proof of causation to defendants because if we measure the chance that any particular manufacturer supplied the injury-causing product by the number of producers of DES, there is a possibility that none of the five defendants in this case produced the offending substance and that the responsible manufacturer, not named in the action, will escape liability.

"But we approach the issue of causation from a different perspective: we hold it to be reasonable in the present context *to measure the likelihood that any of the defendants supplied the product* which allegedly injured plaintiff by the percentage which the DES *sold by each of them for the purpose of preventing miscarriage* bears to the entire production of the drug *sold by all for that purpose.*

". . . . . . . . . . . . . . . .

"The presence in the action of a substantial share of the *appropriate market* also provides a ready means to apportion damages among the defendants. Each defendant will be held liable for the proportion of the judgment represented by its share of *that market* unless it demonstrates that it could not have made the product which caused plaintiff's injuries." (26 Cal.3d at pp. 611-612; italics added.)

I agree with the majority that in the form it was presented the hearsay report attached to Mr. O'Donovan's declaration was not competent evidence. However, the remainder of his declaration was based on his personal knowledge and established that Miles Laboratories manufactured and sold DES only for the palliative treatment of prostatic cancer; that its labeling referred only to that use; and that Miles Labo-

ratories never marketed, promoted or sold DES in any form for use by women as a miscarriage preventative or for any other purpose.

If those are the facts, Miles Laboratories cannot be liable under *Sindell* and it is beyond my ken how in right reason it can be held liable under any legally recognized theory. To hold it liable under those circumstances would punish it for not promoting and marketing DES for experimental use and reward those manufacturers who did promote and market it for that use, allegedly without warning of its experimental status for that use.

As the majority state the basic allegation of the complaint is that the defendants, individually and in concert, promoted the sale of DES *for use by pregnant women for the prevention of miscarriages* and that they knew or should have known that DES was neither safe nor effective for that purpose. The O'Donovan declaration establishes that those allegations are not true as to Miles Laboratories. The majority nevertheless purport to find another theory of liability in allegations that the defendants knew or should have known and fully expected that promotion by any one of them of its DES as a miscarriage preventative was mutually advantageous to and exploited by all defendants in boosting sales of DES, that the defendants knew or should have known that pharmacists filled prescriptions for the drug on a generic basis, mixing and commingling various brands; and that the defendants planned for, exploited and reaped the profits from this marketing and promotional scheme. With reference to substantially similar allegations in the *Sindell* case,[1] the court in *Sindell* concluded: "[T]his litany of charges is insufficient to allege a cause of action [under the "concert of action" theory]." (26 Cal.3d at p. 605.) And that was in a case in which all the defendants *had* allegedly manufactured and advertised the drug for use as a miscarriage preventative.

The majority's reference to "a question of fact . . . as to the adequacy of the label described by the O'Donovan declaration" (*ante*, p. 596) is unfortunate and can only serve to confuse the development of the law in

---

[1] In *Sindell* the plaintiff alleged inter alia that the defendants' wrongful conduct was "the result of planned and concerted action, express and implied agreements, collaboration in, reliance upon, acquiescence in and ratification, exploitation and adoption of each other's testing, marketing methods, lack of warnings . . . and other acts or omissions . . ." and that "acting individually and in concert, [defendants] promoted, approved, authorized, acquiesced in and reaped profits from sales" of DES. (26 Cal.3d at pp. 604-605.)

this area. Miles Laboratories' label indicates only one use for the drug —"palliative treatment of prostatic cancer"; it says nothing whatever about use of the drug by women or as a miscarriage preventative. Apparently the majority would require the Miles Laboratories label to state affirmatively something like "not safe for use as a miscarriage preventative." But suppose it had?

Plaintiff's mother, of course, would have had no occasion to see the label. By hypothesis pharmacists fill prescriptions for DES from various brands indiscriminately. If the pharmacist who filled plaintiff's mother's prescription for DES were aware that Miles Laboratories' Stilphostrol was nothing more or less than DES, he would have done one of two things: either he would have filled the prescription with the Miles Laboratories' product despite any contraindication on the label or he would have filled the prescription with DES of another brand. In either case plaintiff's mother would have still taken the drug and plaintiff would still have suffered the same injury. Thus, no failure to include on the label a warning against use as a miscarriage preventative could have been a cause in fact of plaintiff's injury, and the imposition of liability predicated on that immaterial fact would be irrational and violative of Miles Laboratories' right to due process of law.

I observe also that the majority would apparently absolve Miles Laboratories of liability if its label had included a warning against use of its product as a miscarriage preventative even if its product were in fact used by the pharmacist to fill plaintiff's mother's prescription. Thus, apparently the majority acknowledge that the mere fact that Miles Laboratories' product might in fact have been supplied to and used by plaintiff's mother is not in itself a sufficient basis on which to impose liability on it. Properly so, for Miles Laboratories had no control over the licenses issued by the FDA to the other drug manufacturers nor any means of controlling or influencing their advertising or promotion of the drug. By hypothesis it likewise had no way to prevent pharmacists from filling prescriptions generically using drugs produced by it.

I concur in the judgment for one reason and one reason only. At the hearing on the motion for summary judgment plaintiff indicated to the court that if the court were inclined to grant the motion, plaintiff requested an opportunity to develop further evidence of a statistical nature. At oral argument in this court it became apparent for the first time, at least to me, what the plaintiff had in mind. Apparently plaintiff proposes to attempt to develop evidence that such a large proportion of

Miles Laboratories' sales of Stilphostrol was attributable to pharmacists using its product to fill prescriptions for DES as a miscarriage preventative that it must have been aware that much of its product was being sold for that use and, notwithstanding its protestations that it did not manufacture the drug for use as a miscarriage preventative, it must be deemed to have known it was in fact manufacturing the drug for that use.

I am persuaded that plaintiff's request for additional time to develop evidence to that effect was what moved the trial court to deny the motion without prejudice. It is reasonable that plaintiff be given the opportunity to develop such evidence if she can, and I cannot conclude the trial court's denial of the motion without prejudice constituted either an act in excess of jurisdiction or a manifest abuse of discretion. I would deny issuance of the peremptory writ solely on that basis. Regrettably, and to me incredibly, unless the Supreme Court is willing to add to its already burdensome caseload, the misconceptions of the majority will become the law of this case and, worse yet, the law of this state.