**TEXAS ENERGY FUELS CORPORATION a/k/a T.W. Oil (Houston) Inc., Plaintiff,**

v.

**PEMCO SUPPLY COMPANY, INC., Defendant.**

Civ. No. 83–0237.

United States District Court, M.D. Pennsylvania.

Feb. 21, 1985.

Lawrence A. Durkin, Scranton, Pa., for plaintiff.

Arthur L. Piccone, Wilkes Barre, Pa., for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

We consider here an action for breach of a contract involving a sale of fuel oil. We have jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201 and 1332. Venue is proper in the Middle District of Pennsylvania by virtue of the fact that Defendant Pemco Supply Company maintains its principal place of business within the Middle District. See 28 U.S.C. § 1391(c).

It is undisputed that the parties were actively negotiating two transactions[1] involving quantities of Number 2 fuel oil in late October and early November of 1982. These negotiations resulted in two contracts which were formalized by mailgrams from the seller (hereinafter Plaintiff) to the buyer (hereinafter Defendant).[2] The mailgram which refers to the disputed transaction provided for the shipment of fuel oil

---

1. One transaction between the parties was identical in all respects to the disputed transaction except that the place of delivery was Linden, New Jersey. Defendant took delivery on this transaction.

2. Testimony established that use of such mailgrams to confirm such agreements is a standard practice in the pipeline shipping industry.

**4**

via the Colonial Pipeline during early[3] December of 1982 to a terminal at Booth Junction, Pennsylvania. A clause near the bottom of this mailgram provided, "If anything outlined above is contrary to your understanding of our agreement, please notify us immediately by Telex or TWX." Varying accounts of the various telephonic conversations triggered by this clause provided much of the testimony heard during the bench trial of this matter which was held on January 30 and 31, 1985. Defendant ultimately refused to accept delivery of the oil at Booth Junction. We find this refusal to be a breach of the contract and that Defendant is liable for damages caused by that breach.

## I. LIABILITY

Our initial inquiry must be whether there was, in fact, a contract between these parties. Plaintiff argues that the mailgram previously alluded to is conclusive evidence that such a contract was formed. While several cases cited by Plaintiff in its trial brief and the testimony of witnesses familiar with the practices prevalent in the fuel oil industry provide *substantial* evidence that the mailgram in question confirmed a binding agreement between the parties, we are not persuaded that this document proves *conclusively* that a contract was formed. At some point[4] after the transmittal of the mailgram on November 5, 1982 an agent of the Defendant called an agent of the Plaintiff to announce that Defendant had no capability of taking delivery of the oil at Booth Junction, Pennsylvania, the designated place of delivery in the mailgram. Then, depending upon whose testimony is credited most heavily, one of two things happened: either (a) the Plaintiff agreed to arrange an "exchange" so that Defendant would receive 25,000 barrels of Number 2 fuel oil at its Beach Haven, Pennsylvania storage facility as a gratuitous accommoda-

tion to the Defendant; or (b) the Defendant agreed to allow more time for Plaintiff to effect a delivery as long as it came within the "early" December time frame.

We think that it matters little which of the above versions is the more accurate. We find, moreover, that the conclusion is inescapable that, at some point between the aforementioned confirmatory mailgram and Defendant's dispatch of a mailgram of its own on November 26, 1982 which purported to "cancel the transaction," these parties did enter into a contract. All the necessary contractual elements were present. The parties exhibited an intent to be bound. The subject matter, price, and place of delivery were agreed upon. What remains for us to consider is whether Defendant's contention that the parties had agreed to make time of the essence is credible. If so, Defendant's cancellation of the contract was a justifiable reaction to Plaintiff's communication of November 18, 1982 to the effect that an "exchange" had been arranged which would make 25,000 barrels of Number 2 fuel oil available to Defendant at Beach Haven on or about December 22, 1982.

Whether time was of the essence in the instant case is a question we must answer with reference to the laws of Pennsylvania because this is a diversity based action. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We first emphasize that the fact that the mailgram specified delivery in early December is not dispositive of this issue. Time for performance is not generally regarded as an essential term in a contract, even though the time for performance may be fixed. *Tolan v. O'Malley*, 450 Pa. 214, 217–18, 299 A.2d 229 (1973). Moreover, in Pennsylvania time is not of the essence in a contract unless it is specifically so provided or unless the circumstances clearly indicate that the parties so in-

---

**3.** Testimony established that "early" December is a term of art in the pipeline shipping industry meaning the first 10 days of December.

**4.** Testimony on behalf of the Plaintiff sets this time around the 17th or 18th of November while testimony on behalf of the Defendant sets this time as several days after receipt of the confirmatory mailgram.

tended. *Easton Theaters Inc. v. Wells Fargo Land and Mortgage Company,* 498 Pa. 557, 449 A.2d 1372 (1982); *James v. Silverstein,* 224 Pa.Super. 489, 306 A.2d 910 (1973). Since there is no express stipulation on the confirmatory mailgram that the parties had agreed to make time of the essence, we must look to the conduct of the parties for an indication as to whether they so agreed.

There was conflicting testimony as to when, or whether, Defendant made it known that it was absolutely imperative that the oil be delivered in "early" December. Thus, a question of credibility arises. If Defendant is to satisfy the second prong of the test announced in *Easton Theaters Inc.,* supra, relative to circumstances providing a clear indication that time was of the essence, it is necessary that Defendant provide convincing testimony or other evidence to that effect.

We must note that we perceived no inaccuracy or contradiction whatsoever in any testimony proffered by Plaintiff's witnesses. Of particular significance was testimony relating to the fact that oil prices began to slide markedly shortly after agents of the respective parties met in Clarks Summit, Pennsylvania in late October of 1982. It is Plaintiff's allegation that it quickly became apparent to Defendant that better prices were available and that, as result, Defendant began to grope for a way to renege. This theory becomes very plausible when comparing certain aspects of Defendant's testimony with the rationale stated on its cancellation notice of November 26, 1982.[5]

The Defendant's key witness, Thomas Quigg, testified that Defendant was justified in cancelling the contract because Defendant had found it necessary to arrange for deliveries from other suppliers so that Defendant could continue to supply its cus-

tomers. Granting veracity to this statement, we can draw no other inference but that business was brisk; so brisk that Defendant felt it could not run the risk of alienating its customers by making them wait for delivery. This explanation advanced by Witness Quigg contrasts starkly with the explanation which appeared on the face of the cancellation mailgram.[6]

When confronted by the written notice during cross-examination, Witness Quigg's attempt to reconcile his testimony with the rationale of the mailgram was implausible at best. Moreover, this Court simply cannot reconcile the fact that Defendant took two deliveries[7] from other distributors in December of 1982, which were arranged subsequent to the one scheduled from Plaintiff, with Defendant's written position that there was a "severe drop in demand" for its product. This obvious inconsistency precludes any finding by this Court that circumstances clearly indicate the parties agreed to make time of the essence in the transaction which is the focus of this lawsuit.

In summation, having reviewed the briefs and various business records which were offered into evidence, and having had an opportunity to observe the witnesses on the stand, we find that a contract was formed between these parties. We find, also, that Defendant's attempt to make time of the essence in this transaction was an attempt at unilateral modification and ineffective. *Clarkson v. Crawford,* 285 Pa. 299, 132 A. 350 (1926). In accord with these findings we rule for Plaintiff.

## II. DAMAGES

██ The amount of damages which should be assessed against Defendant in this matter is not readily determinable. When oil is put into a pipeline it is assigned a "batch" number. The testimony shows

---

**5.** This notice was sent some 5 days after the oil had begun its northward journey in the pipeline.

**6.** See Plaintiff's Exhibit No. 11, which states in pertinent part: "Due to severe drop in demand

and customer cancellations we will not be able to store or pay for the products."

**7.** The record reflects that these deliveries were of 15,000 barrels and 290,000 gallons respectively.

that such a "batch" is not easily traced when an order is refused or cancelled. Ultimately, such oil often is commingled with other "batches" from other suppliers. This fact coupled with the rapid price fluctuations which are typical in this industry make it impossible to determine exactly what price a "batch" such as the one Defendant refused to accept here brought. Plaintiff originally claimed damages of $139,125.00. This figure was computed using a formula consistent with the provisions of the Uniform Commercial Code as specified in 13 Pa. C.S.A. § 2708(a).[8]

(1) 42 gallons per barrel
   25,000 barrels × 42 = 1,050,000 gallons

(2) 1,050,000 gallons × $.9825 the (contract price) = $1,031,625.00
   1,050,000 gallons × $.8500 (the Platt Index price)[9] = $892,500.00

The difference between these figures, $139,125.00, is the amount of damages originally claimed by the Plaintiff.

Defendant objected to this method of estimating Plaintiff's damages and demanded that Plaintiff make an effort to ascertain where the 25,000 barrels in question were sold and for what price. While Plaintiff stated that it is utterly impossible to tell where each gallon in dispute went, Plaintiff was provoked into taking a harder look at its claim and the result was an alternative, and higher, damages assessment of $161,175.00. This figure was calculated from the sale records compiled in Plaintiff's Exhibit Number 15.

While we are inclined to accept Plaintiff's contention that it is impossible to determine who purchased the 25,000 barrels in dispute and at what price, we are disinclined to accept the new damage figure. This new figure is based upon sales

which were completed in December of 1982. The sale which is the focus of this lawsuit was made approximately one month earlier. As mentioned previously, the market for fuel oil was in a state of flux in November and December of 1982. For this reason we see little relevance in applying the prices of contracts consummated in December of that year to the damage aspect of this case. We think it for more precise, far more just, and consistent with the Uniform Commercial Code as adopted in Pennsylvania to use Plaintiff's initial figure as the measure of damages here. An appropriate *Order* shall issue.

---

8. This statute provides, in pertinent part: ... the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this division (section 2710) but less expenses saved in consequence of the breach by the buyer.

9. The Platt Index is a publication which, *inter alia*, quotes the average contract and spot prices obtained each day for fuel oil and other petroleum products. The Platt Index is regarded as a definitive means of determining such prices in the fuel oil shipping industry.