JUNE G. ASHTON INTERIORS, Plaintiff-Appellee, v. STARK CARPET CORPORATION, Defendant-Appellant.

First District (4th Division)   No. 85—1751

Opinion filed March 20, 1986.

Richard J. Sorman & Associates, of Chicago (Richard J. Sorman, of counsel), for appellant.

Isham, Lincoln & Beale, of Chicago (Michael J. Gill and Denise L. Jarrard, of counsel), for appellee.

JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, June G. Ashton Interiors (Ashton), brought this action against the defendant, Stark Carpet Corporation (Stark), for breach of a written contract entered into on August 9, 1982, for the purchase of carpeting to be installed in the home of a client of Ashton. Stark counterclaimed for the balance due under the contract in the amount of $6,292. The trial court entered judgment in favor of Ashton in the amounts of $6,292, a refund of her deposit paid under

the contract, and $3,891, a recovery of her lost resale profits if the contract had been performed. Stark now appeals claiming that the trial court erred in entering judgment against it as there was no material breach of the contract and the goods were otherwise conforming. Also, Stark argues that the trial court erred in denying its counterclaim for damages incurred as a result of Ashton's wrongful cancellation of the contract.

Ashton had been an interior decorator for nearly 24 years. For the past 14 years, she had been self-employed and had owned the interior decorating business known as June G. Ashton Interiors. In May of 1982, Ashton was commissioned by one of her clients to acquire carpeting for the client's home. Specifically, Ashton was asked to locate carpeting for two areas of the home: the first-floor entrance hall or foyer and stairway abutting the entrance hall, and the second-floor hallway. Ashton subsequently contacted Stark and consulted with its salesperson, Ken Gosh, about her client's carpet requirements. She selected the yarns that were to be dyed and woven to her specifications. During these preliminary discussions, Ashton was informed that the carpeting would be delivered within four to five months from the date the orders were placed.

Based on these discussions, two confirmation orders for the carpeting were prepared by Stark's salesperson on July 15, 1983. The first confirmation order specified carpeting for the stairway and second-floor hall runner. In addition, part of this carpet order was to be cut into a small area rug to be placed in the upper hallway. The second confirmation order was for two area rugs for the first-floor foyer and the second-floor hallway. The orders indicated that delivery was to be f.o.b. New York.

On August 19, 1982, two purchase orders were prepared by Ashton for the two lots of carpeting described in the confirmation orders. These purchase orders directed Stark to ship both lots of carpeting to Camelot Carpet, Stark's Chicago warehouse and to tag the carpets, "Ashton/Mrs. McCormick." Ashton signed the confirmation orders and paid a 50% deposit on the carpeting in two separate checks, one in the amount of $2,932.50 and the other $3,359.50. Printed on one of the purchase orders was a delivery date of "approximately four to five months." Ashton testified that at trial that she was assured by Stark's salesperson, Ken Gosh, that the carpeting would be delivered within four to five months from the date the orders were placed. She stated that she also wrote this delivery information on her copy of one of the confirmation orders.

Ashton testified that her next contact with Stark was in late No-

vember when she inquired as to the date her carpeting would be delivered. Stark's salesperson, Ken Gosh, stated he would check with New York on the status of her carpeting. At the request of her client, Ashton on December 10, 1982, again telephoned Gosh to determine the status of the carpeting and its expected delivery date. He told Ashton that the carpeting would not be in before the end of the year but that it was "on the waters." Ashton interpreted this statement to mean that the carpeting was in the process of being shipped to her from England where the carpeting was being woven.

Ashton's next contact with Stark was on February 3, 1983, at the request of her client. She again spoke with Ken Gosh and told him that her client wanted to cancel the orders because the goods had not yet been received. Later that same day, Ashton was contacted by Stark's regional manager, Paul Adams, concerning her attempt to cancel the carpeting orders. Adams told Ashton that the information that the carpeting was "on the waters" was erroneous. Adams indicated that he would check on the status of her carpeting and would try to get some firm information on delivery dates from the mill in order to arrange a revised delivery schedule. Adams testified that at this time the mills had not yet started to weave the carpeting.

On February 7, Ashton received a call from Adams informing her that he had called the mill in England and had worked out a revised delivery schedule. He stated that Stark would receive the order for the foyer and stairway carpeting in Chicago on February 18. The balance of the goods would follow on February 25. A letter dated February 8, 1983, signed by Paul Adams, confirmed the substance of their February 7 telephone conversation and the agreed-upon revised delivery schedule.

The next communication with Stark occurred on February 18, when Ashton stated that she called Adams concerning the stairway carpeting that was to arrive that day. She stated that she was informed by Adams that the first lot of carpeting was still in New York. In contrast, Adams testified that the first lot of stairway and foyer carpeting had arrived at Camelot Carpet in Chicago on February 18. Adams stated that at this time he informed Ashton that the carpeting had arrived, but she stated that she did not wish to receive the goods at that time until all the carpeting had arrived.

Sometime between February 18 and February 25, Ashton again telephoned Adams to determine whether the first lot of carpeting had been delivered on February 18 as scheduled, and whether the second lot of carpeting would also arrive in New York on February 25. According to Ashton, Adams informed her that the first lot of carpeting

had arrived in Chicago but that the second lot of carpeting, the area rugs, was still in New York and the borders were not attached to the rugs and would therefore require two more weeks to be assembled and delivered to Chicago. He told Ashton that he could fly the carpets to Chicago in one day. On February 25, Ashton informed Adams that she was cancelling the carpet orders pursuant to her client's request. Adams testified that the second lot of carpeting was shipped to Chicago and arrived on February 26.

On February 28, Ashton, despite her cancellation on February 25, went to Camelot Carpet to locate the carpeting. She stated that if the carpeting had been delivered, she would have accepted it despite the late delivery. She asked for the carpeting tagged "Ashton/Mrs. Mc-Cormick." However, only the first lot of carpeting, the stairway carpeting, which she was told by the warehouseman had arrived on February 24, was located. At this time, the small area rug had not yet been cut from the first lot of carpeting as specified in the purchase order. The second lot of carpeting could not be located, and Ashton was informed that Camelot Carpet did not have it. Later that same day, Ashton telephoned Stark to cancel the carpeting orders. She confirmed this cancellation in a letter sent to the president of Stark, in which she also demanded a refund of the deposit she had already paid to Stark under the contract.

The next communication occurred on March 9 when Ashton received a mailgram from the president of Stark stating that the second lot of carpeting was still in New York and that it would be approximately three days before the carpeting would be completed and flown to Chicago. Adams testified that this information was erroneous and the second lot of carpeting was in fact in Chicago at that time. There was testimony that the area rug which was to be cut from the first lot of stairway carpeting was cut sometime after March 17. The second lot of carpeting was still to be assembled. Ashton testified that her contract with her client for the carpeting was cancelled, although she was able to partially replace the order and obtain a $400 commission. She stated that if the original contract for the carpeting had been performed she would have gotten approximately $4,300 in commission.

Ashton brought this action against Stark alleging that Stark had breached its contract with her by failing to timely deliver the carpeting she had ordered from it. The trial court entered judgment in favor of Ashton, finding that the February 8 letter from Stark to Ashton was a modification of the original August 9 contract and established firm dates of delivery of the carpeting to Chicago. Consequently, as

Stark did not deliver the carpet to Ashton in accordance with the modified contract, Stark's failure to perform the contract, as modified, was a breach of the contract, thereby entitling Ashton to recover damages. Accordingly, Ashton was awarded $10,583 in damages, less the $400 commission Ashton had secured.

We first consider whether the February 8 letter, setting forth the February 18 and February 25 delivery dates, was a modification to the August 9, 1982, contract. The August 9, 1982, contract did not specify exact dates for the delivery of the carpeting, but rather, stated that delivery was to be within approximately four to five months from the date the order was placed. On February 3, nearly six months after the order had been made, Ashton attempted to cancel the contract because of Stark's failure to deliver the carpeting. Stark then agreed on February 7, confirmed by letter dated February 8, to deliver both lots of carpeting to Chicago on February 18 and February 25. In the February 8 letter, Stark stated that the carpeting would "arrive in Chicago no later than" the specified date and that it would assume the expense of flying the goods directly to Chicago. The letter also stated that Stark would assure that this schedule was maintained.

■ The instant contract is subject to the provisions of the Uniform Commercial Code (UCC) as adopted in Illinois. (Ill. Rev. Stat. 1983, ch. 26, pars. 1—101 *et seq.*, 2—102.) Under the UCC, an agreement modifying a contract needs no consideration to be binding but must be in writing signed by the party against which enforcement is sought. (Ill. Rev. Stat. 1983, ch. 26, pars. 2—201, 2—209(1) and (3).) The February 8 letter signed by Stark constituted a written confirmation of the carpeting delivery schedule orally agreed upon on February 7, thereby satisfying the requirements of the UCC to be a modification of the contract.

The trial court's finding that the parties intended the February 8 letter to modify the original contract and to establish definite and binding delivery dates is supported by the evidence. Ashton had testified that she had repeatedly contacted Stark about the expected delivery dates of the carpeting. After six months had elapsed from the time the orders had been made, Ashton on February 3 notified Stark that pursuant to her client's request she intended to cancel the contract because of the delays in delivery. Ashton agreed not to cancel the contract after she received written confirmation by Stark that the carpeting would be delivered to Chicago no later than February 18 and February 25. This testimony, together with the language used in the February 8 letter, could reasonably be found to accomplish a bind-

ing modification of the original contract. In addition to modifying the delivery schedule for the carpeting, the original contract had specified Stark's delivery to be f.o.b. New York. In the February 8 letter, Stark agreed to assume the responsibility to deliver the carpeting to Chicago by the specified dates.

■ The next question this court must consider is whether the trial court's finding that Stark's failure to timely deliver conforming goods, in accordance with the contract, as modified, constituted a material breach of the contract. Considering the first lot of carpeting, there was evidence presented that it was not timely delivered on February 18, as specified under the contract as modified. In addition, the carpeting was not conforming to the terms of the contract, as an area rug had not been cut from the carpeting and was not completed until March 17. Further, the second lot of carpeting which was scheduled for delivery in Chicago on February 25 was still in New York and unassembled on March 9, eight months after the original contract had been entered into and nearly two weeks after the delivery date under the modified contract. While Stark presented conflicting testimony that the first lot of carpeting arrived in Chicago on February 18 and the second lot on February 26, it was clear that Stark never informed Ashton as to the arrival of the carpeting in Chicago. Nevertheless, it was for the trial court to assess the credibility of the witnesses and determine the weight to be given their testimony. (*Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 986, 466 N.E.2d 958.) From the evidence presented at trial it was reasonable for the trial court to infer that both lots of carpeting were not delivered in accordance with the contract as modified.

Under section 2—507 of the UCC, proper tender is a condition to the buyer's duty to accept the goods and to pay for them. (Ill. Rev. Stat. 1983, ch. 26, par. 2—507(1).) If the tender of delivery fails in any respect to conform to the contract, the buyer may cancel the entire contract and is entitled to a return of any money paid by him and to recover damages. (Ill. Rev. Stat. 1983, ch. 26, pars. 2—601(a), 2—711(1), and 2—715.) We conclude that Stark materially breached its contract by failing to timely deliver the carpeting to Ashton. The evidence at trial established that time of delivery was imperative. Ashton had attempted to cancel the original contract solely because of delay in delivery. Stark agreed in the February 8 contract modification to deliver the carpeting by February 18 and February 25 to Chicago. Stark was aware that Ashton's client had wanted to cancel the original contract because of the late delivery. Stark was therefore aware of Ashton's need for timely performance and the reasons for and impor-

tance of the delivery schedule agreed to on February 8. Thus, a two- to three-week delay in delivering the carpeting constituted a material breach of contract.

■ Stark argues that despite any breach in its performance Ashton cannot cancel the contract because she did not allow it to cure the late delivery. Under section 2—508 where a buyer rejects a non-conforming tender, a seller will be allowed a further reasonable time after the time for performance has passed to substitute a conforming tender if he seasonably notifies the buyer of its intention to cure. (Ill. Rev. Stat. 1983, ch. 26, par. 2—508(2).) Ashton cancelled on February 25. She went to the warehouse on February 28 in the hopes that she could still recover the carpeting and salvage her contract with her client. On February 28, the second lot of carpeting could not be located. Later that day, Ashton telephoned Stark to cancel the carpeting as she believed that the second lot of carpeting was not in Chicago. Stark never notified Ashton of any intention to cure in response to her February 28 telephone call and letter cancelling the carpeting. Adams stated that all of the carpeting was in Chicago on February 26. However, Stark never informed Ashton of its arrival. Its first contact with Ashton was on March 9. The notice on March 9 does not constitute a "seasonable" notice of its intention to cure and Stark did not show that it was in a position to cure since it informed her that the second lot of carpeting was still in New York and unassembled and there was evidence that the area rug was still to be cut from the first lot of carpeting.

Furthermore, there is no merit to Stark's argument that tender of delivery to Ashton occurred on February 25 when the second lot of carpeting was placed on a common carrier in New York. As we discussed earlier, the February 8 agreement modified the original contract terms which provided that shipment of the carpeting would be f.o.b. New York. Under the contract as modified, Stark agreed to deliver the carpeting to Chicago on February 25; therefore, the contract became a destination contract which required Stark to "put and hold conforming goods at the buyer's disposition [at the destination] and give the buyer any notification reasonably necessary to enable him to take delivery." (Ill. Rev. Stat. 1983, ch. 26, pars. 2—503(1), 2—319(1)(b).) Therefore, even if we accepted Stark's evidence that the second lot of carpeting arrived in Chicago on February 26, Stark had to make the goods physically available to Ashton at the destination so that she could take possession of them. This Stark failed to do. Ashton went to Stark's warehouse in Chicago on February 28 to take delivery of both lots of carpeting. It became Stark's duty to produce

the carpets. Stark failed to make these carpets available to Ashton. Stark argues that its failure to locate the carpeting was due to Ashton's failure to present proper tagging instructions which were necessary to locate the carpet. However, it was Stark's duty to give Ashton any specific instructions which would be necessary for her to take delivery. Stark did not inform Ashton of the importance of the tagging numbers to locate the carpeting. Even after Ashton telephoned Stark on February 28, Stark still did not inform her about the procedures for locating the carpeting nor the importance of the tagging identification numbers. Under these circumstances, Stark did not give Ashton the reasonable notice necessary to take delivery.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P.J., and JOHNSON, J., concur.