**A1 FERRO COMMODITIES CORP.,
S.A., Plaintiff,**

v.

**TUBE CITY IRON AND METAL
COMPANY, Defendant.**

Civ. A. No. 88–7290.

United States District Court,
E.D. Pennsylvania.

Jan. 10, 1990.

Stephen W. Miller, and James B. Burns, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

Daniel J. Dugan, Spector, Cohen, Gadon & Rosen, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DuBOIS, District Judge.

Plaintiff, A1 Ferro Commodities Corp., S.A. ("A1 Ferro"), instituted this action against the defendant, Tube City Iron and Metal Company ("Tube City")[1], for breach of contract relating to the sale of 8500 metric tons of scrap steel. A1 Ferro claims that Tube City breached the contract by failing to nominate a vessel to take delivery of the scrap and thus forcing A1 Ferro to sell the scrap to another buyer at a net loss to A1 Ferro of $115,942.

Tube City filed a counterclaim against A1 Ferro alleging that A1 Ferro breached the contract by not accepting Tube City's nomination of a vessel. Tube City claims that A1 Ferro deprived Tube City of resale profits on the scrap of $104,315.

The Court held a non-jury trial in the case which concluded on September 28, 1989. For the reasons set forth in the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. Rule 52(a), the Court finds in favor of A1 Ferro and against Tube City in the amount of $71,535, and against Tube City on its counterclaim.

## I. FINDINGS OF FACT—LIABILITY

A1 Ferro is a company organized and existing under the laws of Switzerland with its principal place of business in Zug, Switzerland. A1 Ferro is in the business of purchasing and selling scrap metals. Tube City is a Delaware Corporation with its principal place of business in Glassport, Pennsylvania. Tube City is also in the business of purchasing and selling scrap metals.

On or about September 30, 1987, A1 Ferro and Tube City entered into an Agreement (the "Agreement") under which Tube City agreed to purchase from A1 Ferro approximately 8,500 metric tons of scrap steel at the price of $115.00 per metric ton.[2] Under the Agreement, A1 Ferro and Tube City provided for delivery of the scrap to Tube City at the port facilities of Patrick J. Craenhals, et Fils ("Craenhals") in Antwerp, Belgium. Craenhals is a Belgian company which specializes in, inter alia, scrap processing and recycling. The Agreement set the delivery date of the scrap as "End October/Early November 1987". The Agreement specifically required that, prior to the delivery date, Tube City nominate a vessel to A1 Ferro to load the scrap.

Under the terms of the Agreement, Tube City, to nominate a vessel, had to provide A1 Ferro with the vessel's name, "characteristics", "lay days", and a request for "stem". (See Special Conditions # 2 of the Agreement). A vessel's "characteristics" include the vessel's class, length, width,

---

1. Since the filing of this action, Tube City Iron and Metal Company has changed its name to Tube City, Inc.

2. Tube City entered into the Agreement and performed acts pursuant to the Agreement at Tube City's place of business in Glassport, Pennsylvania.

draft, size and number of holds, and size and number of hatches; "lay days" are the dates on which the vessel may be in port to load the goods; and a request for "stem" is a request for the shipper's commitment to accept and load the vessel some time during the proposed lay days.

In early October, 1987, Tube City informed A1 Ferro that Tube City had inspected the scrap at Craenhals' facilities and found the scrap to conform to the Agreement. Later in October, 1987, Tube City and A1 Ferro worked out and confirmed Tube City's financing (*i.e.* a letter of credit) for the scrap. Towards the end of October, 1987, A1 Ferro and Tube City began to exchange telexes concerning the nomination of a vessel.

On October 23, 1987, Jose A. Castillo, A1 Ferro's agent throughout the transaction who was based in Madrid, Spain, sent a telex to Harry Humphreys, an officer of Tube City, stating that the scrap was ready for "prompt shipment" and A1 Ferro awaited Tube City's nomination of a vessel. Mr. Humphreys telexed a reply to Mr. Castillo on October 26, 1987, that Tube City was in the market for a vessel. In response, Mr. Castillo telexed Mr. Humphreys on October 26, 1987, that the berth was "presently available for loading" and A1 Ferro awaited Tube City's nomination of a vessel.

The parties next communicated concerning the matter when Mr. Castillo and Mr. Humphreys met by chance in Zurich, Switzerland in early November, 1987. Mr. Castillo was in Zurich attending a convention for scrap metal dealers. Mr. Humphreys, while not registered at the convention, arrived in Zurich on the evening of November 3, 1987. The following day, November 4, 1987, Mr. Humphreys met with Mr. Castillo in the lobby of the hotel where the convention was being held.

During the meeting in the lobby, Mr. Humphreys showed Mr. Castillo a copy of one of two telexes concerning a ship which Tube City had been trying to obtain. Both telexes named a vessel, the M.V. Anezina. However, one of the telexes did not set forth proposed "lay days for stem". *See* Plaintiff's Exhibit 13. The other telex did not set forth the "characteristics" of a vessel. *See* Defendant's Exhibit "15" (Stamp 00084).

Mr. Humphreys and Mr. Castillo did not discuss the matter further in Zurich. Mr. Castillo left for Madrid on the evening of November 4, 1987. Mr. Humphreys left for Rotterdam on the morning of November 5, 1987.

Mr. Castillo sent Tube City a telex from Madrid on the evening of November 4, 1987, asking Tube City for a nomination, including a vessel's name and "lay days". No one from Tube City responded to Mr. Castillo's November 4, 1987 telex.

On November 9, 1987, Mr. Castillo sent a telex to Tube City asking Tube City for a nomination. On November 10, 1987, Mr. Humphreys sent Mr. Castillo a telex stating that Tube City intended to take delivery of the scrap and suggested a two-week delay in fixing a vessel for loading.

On November 11, 1987, Mr. Castillo advised Mr. Humphreys by telex that A1 Ferro would ask its shippers to delay the shipping date until "November 17/24". Mr. Castillo added that Tube City would have to extend its letter of credit with its bank, under which Tube City expected to pay for the scrap.

The following day, November 12, 1987, Mr. Castillo informed Mr. Humphreys by telex that the shipping date could be extended to the end of November, 1987. Mr. Castillo also reminded Tube City to extend its letter of credit with its bank.

On November 18, 1987, Mr. Castillo sent a telex to Mr. Humphreys requesting Tube City's nomination. Mr. Castillo stated in the telex that Tube City's delays were causing serious problems for the shippers (Craenhals) in tying up the port facilities. The telex also stated that Craenhals had to load the goods by "end November, latest 4th December".

On November 19, 1987, Mr. Castillo sent a follow-up telex to Mr. Humphreys stating that Tube City had to immediately nominate a vessel. Mr. Castillo added that Craenhals had "serious" storage expenses, which Tube City would have to pay. Mr.

Humphreys replied to Mr. Castillo by telex on November 19, 1987, that Tube City was in the market for a vessel and would keep A1 Ferro advised as to its progress.

On November 24, 1987, Mr. Castillo sent a telex to Mr. Humphreys which stated, in part: "It is essential Tube City declare in this week a vessel to load this cargo, as otherwise and definitively the sellers/shippers will consider the contract defaulted...." Neither Mr. Humphreys, nor any other representative from Tube City, responded to Mr. Castillo's November 24, 1987 telex.

In a telex dated November 30, 1987, Mr. Castillo told Mr. Humphreys that Tube City had to take immediate action to accept the steel or else face legal action. A1 Ferro received no response to the November 30, 1987 telex until December 8, 1987.

On December 8, 1987, Mr. Humphreys sent Mr. Castillo a telex stating that Tube City was working a ship for the December 10–20, 1987 period. Mr. Castillo replied by telex on December 8, 1987, that the delivery date could be extended to December 10–20, 1987.

On December 10, 1987, the law firm of Baker & McKenzie sent Tube City a letter on behalf of Mr. Castillo and A1 Ferro stating A1 Ferro's intention to hold Tube City liable for Craenhals' storage expenses.

On December 14, 1987, Mr. Humphreys inquired by telex as to whether Craenhals' port could accomodate a vessel with a draft of 36 feet. In that telex, Mr. Humphreys also stated that Tube City had the M.V. Adolph Leonhardt ready to load for the December 16–18, 1987 period. On December 15, 1987, Mr. Castillo informed Mr. Humphreys by telex that Craenhals' facilities could not accomodate a vessel with a draft over 34.5 feet.

Later on December 15, 1987, Mr. Humphreys sent a telex to Mr. Castillo proposing the M.V. Maloja II for loading with lay days of December 19–25, 1987. On December 16, 1987, Mr. Castillo sent a reply telex to Mr. Humphreys stating that A1 Ferro would consider the M.V. Maloja II if Tube City agreed to pay A1 Ferro the interest and storage charges incurred by Craenhals

as a result of Tube City's delays in taking delivery of the scrap. In response, Michael Coslov, Chairman and Chief Executive Officer of Tube City, telephoned Mr. Castillo on December 16, 1987, rejecting A1 Ferro's offer to accept the M.V. Maloja II only if Tube City agreed to pay the interest and storage charges incurred by Craenhals. Later on December 16, 1987, Mr. Castillo sent a second telex to Tube City in which Mr. Castillo confirmed Tube City's refusal to pay interest and storage charges. In that same telex, Mr. Castillo offered to set aside the interest and storage charges, reserving that claim for the courts, provided Tube City could charter the M.V. Maloja II to load the scrap. In a telex dated December 16, 1987, Robert Odle, President of Tube City, stated to Mr. Castillo that Tube City had lost its option on the M.V. Maloja II.

On December 18, 1987, Mr. Odle sent a telex to Mr. Castillo stating that Tube City was "trying to trade" two other vessels, the M.V. Senator and the M.V. Rank. The M.V. Senator and M.V. Rank had proposed lay day periods of December 30, 1987 to January 8, 1988 and January 5, 1988 to January 15, 1988, respectively. No one from A1 Ferro responded to Mr. Odle's December 18, 1987 telex.

On December 22, 1987, Arthur R. Spector, Tube City's attorney, initiated a telephone conference call with Mr. Coslov, Mr. Odle, and Michael Mesnik, A1 Ferro's attorney, in an effort to avert the impending sale of the scrap. In the telephone conference, the representatives of Tube City told Mr. Mesnick that Tube City was still interested in making a nomination; Mr. Mesnick agreed to communicate Tube City's continued interest to Mr. Castillo. The parties also agreed during the telephone conference that it would be best to reserve their legal claims (relating to the previous failed nominations) until after a vessel was nominated and the scrap was delivered.

Mr. Mesnik called Mr. Castillo that same day, December 22, 1987, to relay Tube City's continued interest in making a nomination. Mr. Castillo instructed Mr. Mesnick that A1 Ferro would still consider a

nomination by Tube City, provided the nomination was made no later than December 23, 1987, and A1 Ferro had the right to accept or reject the nomination within a 24–hour period. Mr. Mesnick relayed Mr. Castillo's terms, orally, to Mr. Spector, who, in turn, relayed the terms, orally, to Mr. Coslov and Mr. Odle.

There was no further communication between the parties on December 22 or December 23, 1987, regarding the nomination of a vessel. Accordingly, A1 Ferro sold the scrap to Nueva Montana Quijano, S.A., Santander, Spain, on December 23, 1987, and notified Tube City of the sale by telex sent from Madrid at 6:45 p.m. Madrid time. As of that time, Tube City had not nominated a vessel to A1 Ferro.

## II. CONCLUSIONS OF LAW—LIABILITY

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). The parties have agreed that Pennsylvania law is applicable to the issues presented, and the Court concurs. While several jurisdictions are implicated in the transaction, Pennsylvania has the greatest number of contacts with the transaction, and a significant interest in the outcome of the suit.[3] *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1311 (3d Cir.1978); *Reading Metal Craft Co. v. Hopf Drive Associates,* 694 F.Supp. 98 (E.D.Pa.1988).

The dispute before the Court centers on whether there was a breach of contract, and if a breach occurred, by whom and at what time. The Court begins its analysis with the meeting between Mr. Castillo and Mr. Humphreys in Zurich, a point at which the Agreement between A1 Ferro and Tube City began to unravel.

On November 4, 1987, Mr. Humphreys met by chance with Mr. Castillo in a hotel lobby in Zurich. During the encounter, Mr. Humphreys showed Mr. Castillo a copy of a telex concerning a ship which Tube City had been trying to obtain.

While the parties dispute which telex Mr. Humphreys showed Mr. Castillo, neither of the telexes constituted a nomination. One telex did not set forth proposed "lay days" for stem. *See* Plaintiff's Exhibit 13. The other telex did not set forth the "characteristics" of a vessel. *See* Defendant's Exhibit "15" (Stamp 00084). Although Mr. Humphreys alleges that he waited in Zurich for Mr. Castillo to call him to discuss matters further, Mr. Humphreys did not attempt to contact Mr. Castillo, and no one from Tube City responded to Mr. Castillo's telex of November 4 from Madrid requesting a nomination.

In their Agreement, A1 Ferro and Tube City included specific terms relating to the nomination of a vessel. The Agreement required Tube City, prior to the delivery date, to nominate a vessel by providing A1 Ferro with the vessel's name, "characteristics" and "lay days for stem".

While in Zurich, Mr. Humphreys never provided Mr. Castillo with all the terms required under the Agreement for a nomination. Thus, Mr. Castillo did not have the information A1 Ferro needed to obtain approval from the shippers on a proposed vessel.

In construing a contract, the intention of the parties is of paramount importance. If the terms of the contract are clearly stated, a court will determine the parties' intention based on the clear wording of the contract. *See O'Farrell v. Steel City Piping Co.,* 266 Pa.Super. 219, 403 A.2d 1319 (1979); and P.L.E. Contracts, § 145 at 180–181.

In Tube City's counterclaim, Tube City alleges that A1 Ferro breached the Agreement in Zurich by not accepting Tube City's nomination of a vessel. The Court rejects Tube City's contention, finding that Tube City did not make a nomination in Zurich on November 4, 1987 pursuant to the terms of the Agreement. The Court, however, does not agree with A1 Ferro that Tube City breached the Agreement as a result of that failed nomination.

---

**3.** Pennsylvania is both Tube City's principal place of business and the place from which Tube City negotiated and accepted the terms of the Agreement. Furthermore, Tube City's performance under the Agreement, such as opening a letter of credit and proposing a vessel, originated in Pennsylvania, albeit assisted by agents and banks elsewhere.

The Agreement between A1 Ferro and Tube City set a delivery date of "End October/Early November, 1987." Thus, while the Court finds that Tube City did not nominate a vessel in Zurich as of November 4, 1987 or immediately thereafter, the delivery date of "End October/Early November, 1987" allowed Tube City some leeway into November, 1987 for the nomination of a vessel. *See Easton Theatres Inc. v. Wells Fargo Land & Mortgage Co.*, 265 Pa.Super. 334, 401 A.2d 1333 (1979); and *James v. Silverstein*, 224 Pa.Super. 489, 306 A.2d 910 (1973).

On November 10, 1987, Tube City sent a telex to A1 Ferro requesting a delay in the delivery date of two weeks. On November 12, 1987 A1 Ferro telexed to Tube City that the delivery date could be extended. That exchange of telexes raises a question as to whether A1 Ferro and Tube City modified their Agreement to extend the delivery date.

■ The Uniform Commercial Code applies to the question of contract modification. The contract between A1 Ferro and Tube City was for the sale of scrap steel, a "transaction in goods" under Article 2 of the Uniform Commercial Code, as adopted by the Commonwealth of Pennsylvania (hereinafter referred to as "the Uniform Commercial Code"). *See* 13 Pa.C.S.A. § 2102. Under the Uniform Commercial Code, consideration is not required for a binding modification. 13 Pa.C.S.A. § 2209(a). Furthermore, while a modification must comply with the Statute of Frauds, 13 Pa.C.S.A. § 2209(c), telexes, such as the ones between A1 Ferro and Tube City, are evidence of a writing in compliance with the Statute of Frauds requirement. *See, e.g., Ore & Chemical Corp. v. Howard Butcher Trading*, 455 F.Supp. 1150 (E.D.Pa.1978).

Under the Uniform Commercial Code, a modification is defined as "[a]n agreement modifying a contract...." 13 Pa.C.S.A. § 2209(a). A single term of a contract, such as price or delivery date, may be modified by the parties without changing the underlying terms of the contract. *See, e.g. June G. Ashton Interiors v. Stark Carpet*, 142 Ill.App.3d 100, 96 Ill.Dec. 306, 491 N.E.2d 120 (1986) (modification of delivery date); *see generally* 2 Anderson, Uniform Commercial Code § 2–209:15. The term "agreement" is defined in the Uniform Commercial Code as a "bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance...." 13 Pa.C.S.A. § 1201.

The Court finds that A1 Ferro and Tube City agreed to extend the delivery date to as late as December 4, 1987, as evidenced by the parties' exchange of telexes. In the telexes, A1 Ferro agreed to extend the delivery date and Tube City agreed to extend its letter of credit. The telexes, which specify the terms of the extensions, evidence a "bargain in fact" or an agreed-to modification.

Notwithstanding the agreement to extend the deadline to December 4, 1987, Tube City made no effort during the extended period to propose a vessel. Despite several written requests from A1 Ferro for a nomination, Tube City did not propose a vessel to A1 Ferro from November 12, 1987, through December 4, 1987, and Tube City did not even respond to A1 Ferro's November 24 and 30, 1987 telexes requesting a nomination until after the December 4, 1987 deadline.

Under the Uniform Commercial Code, a contract may be repudiated if a party to the contract fails to provide adequate assurance of performance when justifiably demanded by the other party. The Uniform Commercial Code provides, in relevant part:

"(a) A contract for sale imposes an obligation on each party that the expectation of the other of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of performance.... (d) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under

the circumstances of the particular case is a repudiation of the contract." 13 Pa.C.S.A. § 2609(a) & (d).

■ The Court finds that Tube City failed to adequately assure A1 Ferro of performance under the contract after receiving numerous written demands for a nomination by December 4, 1987. Such conduct by Tube City constituted a repudiation of the contract. *See* 13 Pa.C.S.A. § 2609, comment 4.

Having determined that there was a repudiation of the contract by Tube City, the Court must next address the question whether there was a retraction of the repudiation. Under the Uniform Commercial Code, a party may retract a repudiation provided the aggrieved party has not cancelled or materially changed his position or indicated that the repudiation is final. *See* 13 Pa.C.S.A. § 2611(a). The retraction of a repudiation can be accomplished by any method which "clearly indicates to the aggrieved party that the repudiating party intends to perform, [and] must include any assurance justifiably demanded under the provisions of this division (section 2609)". 13 Pa.C.S.A. § 2611(b).

Here, Tube City proposed to A1 Ferro to take delivery of the scrap shortly after expiration of the December 4, 1987 deadline. In a telex dated December 8, 1987, Tube City stated that it could have a ship ready during the December 10–20, 1987 period. A1 Ferro, responding to Tube City's proposal, sent a telex to Tube City on December 8, 1987, agreeing to extend the shipment delivery date to December 10–20, 1987.

■ The Court finds that, by telex dated December 8, 1987, Tube City retracted its repudiation of the Agreement by clearly indicating to A1 Ferro its intent to perform under the Agreement. The Court also finds that the parties' exchange of telexes on December 8, 1987, constituted a modification of the Agreement which extended the shipment delivery date to December 10–20, 1987. 13 Pa.C.S.A. § 2209(a); *see* 4 Anderson, Uniform Commercial Code § 2–611:7 (modification of contract after retraction of repudiation).

■ Although Tube City proposed three vessels, the M.V. Maloja II, the M.V. Senator, and the M.V. Rank, to A1 Ferro during the December 10–20, 1987 period, the Court finds that none of Tube City's proposals complied with the parties' modification of the Agreement which extended the shipment delivery date to December 20, 1987. First, all three vessels proposed by Tube City had proposed lay days which went beyond the December 20, 1987 shipment delivery date. Second, the Court rejects Tube City's argument that A1 Ferro imposed unreasonable conditions on Tube City by insisting upon the payment of interest and storage charges. A1 Ferro expressly reserved its right to collect these charges from Tube City in several telexes sent to Tube City prior to the December 8, 1987 modification of the Agreement, 13 Pa.C.S.A. § 1207, and A1 Ferro had the right to demand these charges following Tube City's repudiation of the Agreement on December 4, 1987. 13 Pa.C.S.A. § 2611(c).

While generally time of performance will not be strictly construed, time may become of the essence if it is stated in the contract or the circumstances are such that the parties intend to make time of the essence. *Texas Energy Fuels Corp. v. Pemco Supply Co., Inc.*, 640 F.Supp. 2 (M.D.Pa.1985); *James v. Silverstein*, 224 Pa.Super. 489, 306 A.2d 910 (1973).

A1 Ferro and Tube City did not make time of the essence in the original Agreement, choosing a deadline of "End October/Early November, 1987." However, by the time of the second extension, a month after the original delivery date, A1 Ferro and Tube City both recognized the urgency of the situation and fixed a definite time for delivery when agreeing to the extended deadline. The Court finds that, as of the second extension of the delivery deadline to December 10–20, 1987, the parties made time of performance of the essence.

As of December 20, 1987, the deadline of the second extension, Tube City had not nominated a vessel to take delivery of the scrap by December 20, 1987. Since time

was of the essence as of the second extension to December 10–20, 1987, and Tube City did not nominate a vessel to take delivery of the scrap by December 20, 1987, the Court finds Tube City repudiated the Agreement a second time on December 20, 1987. As of that date, by reason of the repudiation, A1 Ferro had the right to sell the scrap. 13 Pa.C.S.A. § 2703(4).

Tube City argues that it retracted its second repudiation of the Agreement on December 22, 1987, or, in the alternative, that it reached a new Agreement with A1 Ferro on that date. The Court finds that there was no retraction of Tube City's second repudiation and that the parties did not enter into a new Agreement on December 22, 1987.

Tube City called A1 Ferro on December 22, 1987, about the possibility of nominating a vessel by December 23, 1987. However, Tube City did not indicate to A1 Ferro when it would nominate on December 23, 1987, or when it would contact A1 Ferro about any such nomination. Moreover, Tube City did not communicate with A1 Ferro about a nomination from the time of the initial calls on December 22, 1987, until after the close of business in Madrid on December 23, 1987. Under the circumstances, the Court finds that Tube City failed to retract its repudiation prior to A1 Ferro's resale of the scrap metal on December 23, 1987. *See* 13 Pa.C.S.A. § 2611(b); 13 Pa.C.S.A. § 2611(b), comment 2.

■ Based on the December 22, 1987 telephone calls, Tube City argues that there was an implied waiver of A1 Ferro's contract rights. The Court disagrees. While an oral attempt to modify a contract can operate as a waiver, 13 Pa.C.S.A. § 2209(d), where a party has repudiated a contract, and the repudiation has not been retracted, the parties do not have an existing contract to modify or attempt to modify. *See Gorge Lumber Co. Inc. v. Brazier Lumber Co. Inc.*, 6 Wash.App. 327, 493 P.2d 782, 10 UCC 609 (Div.1972). In *Gorge Lumber Co.*, the court held that where the seller had previously repudiated a contract for the sale of lumber, the buyer's oral representations (following the re-

pudiation) could not operate as a waiver of the buyer's rights, given that the contract had been repudiated. *See Gorge Lumber Co.*, 493 P.2d at 787.

The Uniform Commercial Code further provides that, following an alleged breach, a waiver or renunciation of a party's rights has to be made in writing by the aggrieved party. 13 Pa.C.S.A. § 1107. No such written waiver occurred with respect to the December 22, 1987 calls.

■ Tube City's argument that the December 22, 1987 telephone calls created a new Agreement must fail because, under the Uniform Commercial Code, an Agreement for the sale of goods over $500.00 is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." 13 Pa.C.S.A. § 2201(a). In the absence of any written exchanges between the parties, and there were none, the calls between Tube City and A1 Ferro on December 22, 1987, cannot be the basis of a new contract.

■ For all of the foregoing reasons, the Court finds in favor of A1 Ferro against Tube City for failing to nominate a vessel pursuant to the Agreement, and rejects Tube City's counterclaim against A1 Ferro based on an alleged nomination by Tube City.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW—DAMAGES

Under the Uniform Commercial Code, when a buyer repudiates a contract, a seller has the right to resell the goods and recover damages under the contract. 13 Pa.C.S.A. § 2703(4). Generally, "the seller may recover the difference between the resale price and contract price together with any incidental damages...." 13 Pa. C.S.A. § 2706(a).

Incidental damages are defined under the Uniform Commercial Code as "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the breach by the buyer, in

connection with return or resale of the goods or otherwise resulting from the breach." 13 Pa.C.S.A. § 2710.

Here, A1 Ferro resold the scrap intended for Tube City to a Spanish buyer, Nueva Montana Quijano S.A., following a period in which A1 Ferro's shippers (Craenhals) had to store the scrap. While A1 Ferro received a higher gross price per metric ton on resale, A1 Ferro had to pay freight and insurance charges on the resale. After deducting these expenses, which Tube City would have been obligated to pay under its Agreement with A1 Ferro, A1 Ferro received a lower net price on the scrap of around $7 per metric ton.

Under general contract principles, resale damages are based on a seller's net resale price. *See* Williston *Treatise on the Law of Contracts* § 1380 (3d ed.1968). Furthermore, under the Uniform Commercial Code, costs to transport goods in connection with a resale are recoverable by the aggrieved seller as incidental damages. 13 Pa.C.S.A. § 2710; *see, e.g., Rodwin Metals, Inc. v. Western Non–Ferrous Metals, Inc.*, 10 Cal. App.3d 219, 88 Cal.Rptr. 778 (1970).

Here, A1 Ferro chartered three ships, the last one leaving Belgium on January 18, 1988, to carry the scrap from Belgium to Spain. In chartering the three ships, A1 Ferro incurred freight charges of between $17.87/ton and $18.82/ton and ship insurance charges in the amount of $ 0.10/ton. After deducting these extra charges ($158,-693 for 8487.82 tons actually shipped) from the gross price paid by the Spanish buyer ($1,071,757), A1 Ferro's net receipts from the re-sale totalled $913,064. Under its contract with Tube City, A1 Ferro would have received $976,099 (8487.82 tons at $115/ton). A1 Ferro thus suffered a net loss on the resale in the amount of $63,035.

A1 Ferro is also entitled to incidental damages relating to the storage of the scrap at Craenhals' facilities subsequent to Tube City's repudiation of the contract on December 4, 1987. 13 Pa.C.S.A. § 2710. Courts have routinely found that costs incurred to store goods are recoverable incidental damages. *See, e.g., Continental Wirt Electronics Corp. v. Sprague Elec-*

*tric Co.*, 329 F.Supp. 959 (E.D.Pa.1971); *Trilling v. Raffaele*, 41 Del.Co. 44 (1954).

Here, Craenhals calculated its total storage costs as $8,500. Craenhals based its storage charges on a $1/ton charge over a one-month period. (Trial Tr. 9/26/89 at 140). Since Tube City first repudiated the contract as early as December 4, 1987, and A1 Ferro did not complete the bulk of its shipments to Spain until mid-January, 1988, the Court finds Craenhals' one-month charge for storage expenses reasonable. Since A1 Ferro is legally liable to Craenhals for its storage charges, and these charges are a result of Tube City's repudiation, Tube City is required to pay to A1 Ferro the amount of the storage charges. *See The Dimitrios Chandris Ring v. The Dimitrios Chandris*, 43 F.Supp. 829, 832–33 (E.D.Pa.1942).

The Court denies recovery to A1 Ferro for its other claimed damages relating to Craenhals' lost income ($30,000) and bank interest charges ($14,407). Both of these charges, as presented at trial, were premised on Craenhals' inability to handle other deliveries while it maintained Tube City's scrap on its docks. (Trial Tr. 141–148). The Court finds these charges, premised on the scrap as an impediment, facially inconsistent with Craenhals' charges for storing the scrap. Furthermore, in reviewing the record, the Court finds that the plaintiff failed to meet its burden of proving these damages with "reasonable certainty". *C.T. Bedwell & Sons, Inc. v. International Fidelity Insurance Company*, 843 F.2d 683 (3rd Cir.1988); *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324, 327 (3rd Cir.1980).

For all of the foregoing reasons, the Court finds in favor of A1 Ferro and against Tube City in the total amount of $71,535, representing net resale losses of $63,035 and incidental damages of $8,500, and against Tube City and in favor of A1 Ferro on Tube City's counterclaim.